## Re Washington County Extended Care Facility

David L. Gilmore, for County Commissioners.
Sanford S. Finder, for County Controller.

SWEET, P. J., March 20, 1975 — Pursuant to the provisions of the Act of August 9, 1955, P.L. 323, as amended, 16 P.S. §2163, the Commissioners of Washington County have petitioned this court for

"approval" of the expenditures of a substantial sum of money for an extended care facility.

We were presented at the start with a question as to the applicability of 16 P.S. §2315. This question we have resolved by considering that the amendment of 1963 absolved us from examining the plans and specifications, but that we may hold such hearings and take such testimony as we need to determine whether or not our requisite approval will be forthcoming.

The nature of this approval is a vexatious concept. When we are called upon to give this kind of approval—

1. Do we sit in the Commissioner's chair and examine the problem de novo?

2. Do we review the facts and determine whether the Commissioners' choice was a reasonable one?

3. Or are we bound to approve what they have done unless it is proved that they have abused their discretion?

Before we can decide whether we approve the sum of money involved in the extended care facility, we must decide what is the standard of review.

It seems to us that probably the second of these is the most likely to be intellectually correct. If we were to review the matter de novo, as for instance we are expected to do when we read marital testimony and determine whether a divorce should be granted, there would be little point in the commissioners making a determination and the act would have called for them to "petition" the court rather than calling for us to grant or withhold approval.

On the other hand, at the other extreme, this should not be like reversing the verdict of a jury. We

can grant a new trial if a verdict is inadequate or excessive or if a determination of guilt is against the weight of the evidence. In such a case, however, we do not merely find that the verdict is too much, but that it is too much too much. We do not have to find an abuse of discretion to withhold approval.

The case for the narrowest construction of the act has been well expressed by Judges Gates, in re Construction and Erection of the Lebanon County Home, Lebanon County, Pennsylvania, 10 Lebanon 76 (1964). He said:

"Under this Act, the approval of the Court of Common Pleas is limited as to the amount of money to be expended. . . . It is our considered opinion that this Act does not require us to pass upon the necessity for or the reasonableness of the amounts expended. We perceive our duty to be to determine whether or not the amounts of money represent the lowest acceptable bid and whether or not the total sum to be expended is provided for by law and by proper resolution of the Commissioners . . . such borrowing does not exceed the constitutional debt limitation."

With all due respect to our learned brother in Lebanon, we think he has written this too narrowly. The act, 16 P.S. §2163, says in dealing with buildings outside the legal system:[1] "Any plan for the erection or substantial alteration of an institution must be approved as to suitability by the Depart-

---

1. "Buildings other than a county courthouse, county jail, prison, workhouse, detention house, etc.," a category that plainly excludes an extended care facility as outside the legal system.

ment of Public Welfare and as to the amount of money to be expended by the court of common pleas." The Lebanon County case reads as if the Act said that "any plan must be approved *as to the formal requisites of a contract* by the court of common pleas."

It is therefore plain that we must either approve or disapprove the amount of money and such requirement is not satisfied merely by observing that the bids are in due form and technically correct. However, we do not need to decide de novo, but with the same attitude that we take toward matters coming before us in our reviewing capacity. In this, we are of course aided by the presumption that official duty is regularly performed: Wheatcroft v. Schmid, 8 Pa. Commonwealth Ct. 1 (1973). It is a rebuttable presumption that public officers act properly and that all necessary prerequisites have been complied with unless the contrary is shown.

With all this in mind, we turn to review the testimony. It is uncontradicted in the record that the building will cost $6,636,307.70 rather than the $5,719,208 averred in the petition. In round numbers this means that the cost per bed of the extended care facility will be about $26,500 rather than $21,500 per bed first mentioned. The facility provides 250 beds. Is it wise to spend so much for so few people?

The architect indicated that the cost of this is a little better than twice Holiday Inn Motel cost per bed and less than one-half the cost per bed of a conventional hospital.

The testimony of Mr. F. D. Whalen, Administrative Assistant and Chief Clerk to the County Commissioners, was to say that this will be paid for almost entirely by the Revenue Sharing moneys. It

seems that we have already spent $60,000 of the Revenue Sharing money on temporary repairs trying to keep our two old folks' homes up at the present time. We have spent $628,286 on the courthouse. Other than this, all the Revenue Sharing money, with insignificant exceptions, has been earmarked for this project. Certificates of deposit in the amount of $2,919,000 were exhibited and examined. These have been specifically earmarked. It is contemplated that all of the rest of Revenue Sharing money which we will get under presently existing law will go to this project.

There is some debate just how much this is. Mr. Whalen said there was $2,275,000 forthcoming over and above what we have now and Mr. Mascara, County Controller, said that Mr. Whalen's estimate was optimistic in the amount of $375,000. If Mr. Mascara is right, after all the presently issued Revenue Sharing money is used, we will have a debit balance of about $1,000,000, and if Mr. Whalen is right, we will have a debit balance of $725,000. The next board of county commissioners will face this question some time in the second half of 1976. Apparently, we will pay as we go on this building and this shortfall will not become an acute problem for a year and a quarter. The present commissioners wisely defer this problem to their successors whomever they may be.

The testimony makes it quite plain that no part of the recent $5,000,000 bond issue is to be used for this purpose. Reed B. Day, Esq., appeared on behalf of several school districts seeking to insure that no part of the $1,000,000, presumably earmarked for the revision of the assessment structure, be diverted to this project. We were assured on the record by the county solicitor that no diversion of any of

the bond issue money was contemplated. The commissioners were present when this was said and we assume that we have a clear-cut commitment from them that the Revenue Sharing money plus the uncommitted nonelectoral borrowing capacity is sufficient to meet the cost of this extended care facility.

It seems to us that if there is to be an extended care facility at all, this price represents the lowest and best bid and is a fair and reasonable amount. There is $120,000 contingency fund built into it, so we should not be faced with any cost overruns. If such develop beyond the contingency fund, further approval from this court must be sought.

It has been held that the hearing before the court on a petition by the county commissioners for approval of plans for the construction of a county courthouse and office facilities cannot be a forum for public debate as to which of five alternative proposals is most acceptable to the taxpayers: In re Construction of County Courthouse and Office Facilities, 15 Adams 1 (1973). Therefore, it is not incumbent upon us to consider other plans. For instance, it might be less costly to board out 250 people to nursing homes and/or foster homes as we do with juveniles. It might be cheaper to contract their care under private enterprise. We do not have to weigh these two alternatives because the act does not require us to see if that what the commissioners have done is the best solution of the problem, but only to "approve" the amount of money to be expended.

Whether or not the entire Revenue Sharing intake of this county, which could meet so many unfilled needs, should be devoted to this one purpose is

fairly debatable. We think it is the commissioners' choice and not ours whether that be done and they have so decided.

To say that we "approve" is therefore legally correct and such is the thrust of this opinion; however, we hope by this caveat to make it clear that the scheme is not ours but theirs and so is the choice of funding technique. The law compels us in this situation either to approve or disapprove. Although we advertised the hearings, not one of the 210,000 people in Washington County appeared to oppose the plan. Doubtless there will be howls, mostly of an untimely and intemperate nature, when the full cost of this is felt. Many who would seek some other disposition of the Revenue Sharing money will complain about this project. Let us remind them now it is not the business of the court of common pleas to mobilize opinion or indulge in propaganda. We operate in the framework of an adversary system and make our choices on the basis of what is presented to us. All we had here was the commissioners' program, their selection of the bidders, and their choice of financing technique.

Under all these circumstances, therefore, we are constrained to issue the following

## ORDER

And now, March 20, 1975, the petition of the commissioners, as more fully set forth and at large in the testimony and the documents of record, is approved within the meaning of the Act of August 9, 1955, P.L. 323, as amended, 16 P.S. §2163.